## Commonwealth v. Whildin

*R. A. Freiler*, deputy district attorney, *M. M. Burke* and *B. J. Duffy*, for Commonwealth.

*A. D. Knittle* and *W. D. Lewis*, for defendant.

KOCH, P. J., November 30, 1931.—We are called upon to interpret the Act of May 8, 1876, P. L. 146, which says: "That any person within this Commonwealth who shall playfully or wantonly point or discharge a gun, pistol or other firearm at any other person shall be guilty of a misdemeanor." What does "wantonly" mean? We will first refer to the facts in the case.

The defendant stands convicted of involuntary manslaughter and of wantonly pointing a pistol. The jury acquitted him on the first count in each of the above-mentioned indictments.

According to the evidence, one Thomas Malloy was shot in the sternum by the defendant when in the barroom of the Log Cabin Inn at Lakewood in this county, between 4 and 5 o'clock in the morning of January 11th last, and died from excessive hemorrhage and shock at the Coaldale Hospital soon after 5 o'clock on that same morning.

Anthony Kazokas testified that he got to the Log Cabin Inn around 4 A. M. and found Whildin and Malloy in the barroom—Whildin back of the bar facing Malloy, who was standing in front of the bar. Kazokas was there twenty-five or thirty minutes. They were talking and having a few drinks. Whildin and Malloy spoke of the latter's proposed purchase of the inn, but Whildin said Malloy's offer was not near enough and he would keep it himself. Then they spoke of burglars and holdup men. He thinks Whildin then said he would show what he would do in case of a holdup and went upstairs, but soon returned to the barroom for some keys and then went upstairs again. Kazokas was eating a sand-

wich at the time and was not paying much attention to the conversation. Whildin, who had gone upstairs the second time, came down with a revolver in his hand and walked behind the bar, and then Kazokas walked out of the barroom because he thought "they were feeling too good to have a pistol between them." They had been drinking whiskey. Kazokas was going out the back way, and when he was going out of the kitchen door he heard a shot. He was then twenty-five to thirty feet away and started back into the barroom. At that time Malloy came out of the barroom and into the kitchen and Whildin followed right behind Malloy. Malloy said to Kazokas, "Slim, I'm shot," and opened his vest, and Kazokas saw blood. Malloy said to Kazokas, "Take me to the Coaldale Hospital," and Kazokas took him to the hospital in Malloy's own car. Whildin went along. Malloy said it was hurting him and Whildin was hysterical. It is about eight miles to the hospital. Kazokas noticed no feeling between Whildin and Malloy. They were apparently friendly before Kazokas walked out of the barroom. There was no quarrel between Whildin and Malloy. Whildin had the pistol hanging down and was going behind the bar when Kazokas got his hat and coat and left the barroom. In the kitchen Whildin said to Malloy, "Tom, you know that I did not do this on purpose," and Malloy replied, "I know that, Jack." Tears were coming out of Whildin's eyes and he was hysterical. In the hospital Kazokas heard Whildin tell them to call the state police.

James L. Gallagher, chief of police of the Borough of Coaldale, testified that he knew Malloy all his life, and also Whildin for a few years; that he was summoned to the Coaldale Hospital about 6 A. M., and there saw the defendant; that the defendant, in an interview, said to Gallagher: "I went upstairs. I got my gun, a .38 special; I came down. I pulled the gun. I thought it was on safe; it was not. It went off; I dropped it." Gallagher further testified that there is no safe on the gun, and that Whildin did not say that he pointed the pistol at Malloy. In another trial Gallagher testified that Whildin told him that he went upstairs to get the gun; that when he came down his finger was on the trigger, and he pulled it, thinking it was on safe, and it went off.

In conversing afterward with Robert L. Hirshman, a state policeman, Whildin, the defendant, told said policeman that Malloy was sitting on a stool in front of the bar when he was shot; that the defendant was standing back of the bar; that they had spoken of holdups and robberies and defendant had told Malloy he would show him what he would do if some one would come in and try "to stick up his place of business;" that then the defendant went upstairs and got his revolver, came down, leaned over the bar, and was showing it to Malloy when, in some unknown manner, it went off; that Malloy immediately told Whildin that he was shot and asked him to get a doctor and then ran out into the kitchen, and that Anthony Kazokas and the defendant then took Malloy to the hospital in Malloy's automobile.

John Whildin, the defendant, testified that he was always friendly with Malloy, whom he knew from 1920; that they never had a quarrel; that Malloy came to see Whildin frequently, three or four times a week in the last six months; that he does not know how the gun went off; that he told Chief of Police Gallagher that he thought the gun was on safe, what he thought was safe; that he always carried one empty chamber under the hammer so in case the gun fell it would not go off, but that there is no actual safe on the gun.

The pistol was found with one chamber entirely empty after the shooting. When the trigger is pulled it advances the next chamber.

Whildin also testified that Malloy was sitting in front of the bar leaning on a stool; that he did not point the gun at Malloy; that just as Whildin brought his hand up over the bar the gun went off, and, by the action of the

gun, he thought the bullet hit the ceiling, but in a few seconds Malloy said "I'm shot," and he got up from the stool, and Whildin said "My God, no." Then Malloy opened his shirt and Whildin saw the blood and knew Malloy was hit. As they went from the barroom, Whildin said: "Tom, I don't know how it went off. You know I did not mean it. I don't know how it went off," and Malloy said, "I know, but get a doctor. Let's go to the hospital." When they were in the automobile to go to the hospital and Kazokas had gone back to get the key to the car out of Malloy's coat in the hotel, Whildin said to Malloy, "Tom, how did it go off?" "I don't know," Whildin said, "You know I didn't mean it," and Malloy said, "I know, Jack, but tell Slim to hurry." During the conversation in the barroom after Whilden told Malloy he was going upstairs for the revolver, Malloy asked: "What kind of a gun have you," and Whildin said, "a .38 special," and Malloy said, "Let's see it," and Whildin went upstairs to get the gun to show it to Malloy.

Such evidence clearly warrants both convictions. But the defendant's counsel earnestly contends that the jury was not properly instructed by the charge of the court, and has filed eleven exceptions thereto.

If the defendant is guilty of wantonly pointing his revolver at Malloy, he must also be guilty of involuntary manslaughter because it resulted from the defendant's unlawful act. In the charge to the jury, the trial judge, inter alia, said: "Wantonly means recklessly or inadvisedly, or thoughtlessly, or without regard to right or consequences. So you see, wantonly does not mean with a malicious or purposeful intent to scare, or even to hurt anybody, but, if it is done thoughtlessly, recklessly, if it is done wantonly, that is denounced by the law as I have read it to you, and the person who is guilty of such offending should be convicted of it."

In Com. v. Thompson, 74 Pa. Superior Ct. 149, 150, we find this: "In addition to its meaning of playfully, wantonly is defined as recklessly, without regard for right or consequences." In Cobb v. Bennett, 75 Pa. 326, 330, the Supreme Court said: "Wantonness is reckless sport, willfully unrestrained action running immoderately into excess."

"A wanton act is an illegal act done when it is needless for any rightful purpose, without adequate legal provocation, and manifests a reckless indifference to the interests and rights of others: Everett v. Receivers of Richmond & D. R. Co., 121 N. C. 519, 27 S. E. 991, 992 (citing State v. Brigman, 94 N. C. 888):" 8 Words and Phrases, Judicially Defined, 7384.

"The word 'wanton,' as used in characterizing the degree or kind of negligence, does not imply the same as willful or intentional, but means something less than willfulness and nothing more than negligence: Cleveland C., C. & St. L. Ry. Co. v. Tartt (U. S.), 64 Fed. 823, 825, 12 C. C. A. 618:" Ibid. 7384 and 7385.

"'Wantonly' means not having a reasonable cause: Everett v. Receivers of Richmond & D. R. Co., 121 N. C. 519, 27 S. E. 991, 992 (citing Clarke v. Hoggins, 103 E. C. L. 543:" Ibid. 7385.

"A person may be regarded as acting 'wantonly' who acts without regard to propriety or to the rights of others, or is careless of consequences, and yet without settled malice: National Folding Box and Paper Co. v. Robertson's Estate (U. S.), 125 Fed. 524, 525:" Ibid. 7385.

"To wantonly do an act is to consciously do it or do it under circumstances that an ordinarily intelligent person would be conscious of doing it, with a knowledge that it may result in damages to another, or under circumstances that an ordinarily intelligent person would have had such knowledge, and to

do it with an utter disregard for the consequences that may result therefrom: Alley *v.* Samples, 194 S. W. 513:" 7 Words and Phrases, Third Series, 941.

Wantonly pointing a pistol is not an assault. "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person:" Butler *v.* Stockdale, 19 Pa. Superior Ct. 98, 107. But wantonly pointing a pistol at another person is also intentional when it is carelessly and knowingly done. A pistol cannot point itself, and the intendment of the act under consideration is that a pistol shall not be pointed at another either playfully or otherwise. Of course, an accidental pointing does not violate the act, but there is no room here for the inference that Whildin accidentally pointed his pistol at Malloy. His intention was to show his pistol to Malloy, and he knew that it was loaded. It, therefore, behooved him to exhibit the pistol with great care. Upon him devolved the duty to handle his pistol thoughtfully and not thoughtlessly under the circumstances. Kazokas, who saw Whildin carry the pistol in his hand behind the bar, left the room "because they were feeling too good to have a pistol between them." Whildin was much under the influence of liquor, and I can see no possible excuse for his trying to exhibit a loaded revolver without doing so carefully. He handled it wantonly and shot Malloy to death and deserves conviction.

A careful consideration of all the exceptions upon which the motion in arrest of judgment and for a new trial is based persuades us that no substantial error exists in this case and that the verdicts of the jury must be upheld.

The motion is overruled and the defendant is ordered to appear in open court at 10 o'clock on Monday morning, December 7th, to receive the sentence of the court.